# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01151-COA

**NATYYO GRAY A/K/A NATYYO N. GRAY**                              **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/28/2013 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF NATYYO GRAY (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR EARLY RELEASE |
| DISPOSITION: | AFFIRMED 11/03/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., ISHEE AND CARLTON, JJ.**

**ISHEE, J., FOR THE COURT:**

¶1. A jury sitting before the Hinds County Circuit Court found Natyyo Gray guilty of capital murder. The circuit court sentenced Gray to life in the custody of the Mississippi Department of Corrections (MDOC). Gray appeals. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    This appeal stems from the death of Aubrey Zoe Brown, the thirteen-month-old daughter of Gray and Phyllis Brown. It is undisputed that Zoe was exclusively in Gray's care for approximately two hours and forty-five minutes before he called 911 and reported that she needed emergency medical attention. It is also undisputed that Zoe died due to internal bleeding caused by significant blunt-force trauma. The jury's verdict supports the following version of events.

¶3.    Brown went to church at approximately 11:00 a.m. on Sunday, November 20, 2011. She left Zoe at home with Gray. They were both asleep when she left. It was the last time that Brown saw Zoe alive. At approximately 1:45 p.m., three firefighters with the Jackson Fire Department were responding to Gray's 911 call. Two minutes after they were dispatched, the firefighters arrived at Brown's apartment.

¶4.    As they pulled up, Gray ran outside with Zoe, who was in cardiac arrest. According to one of the firefighters, Gray was pressing Zoe's stomach. Firefighter Zeric Washington took Zoe from Gray and started performing chest compressions. Lieutenant Mario English placed an "ambu bag" over Zoe's mouth to deliver oxygen. Because Lieutenant English had experience performing CPR on infants, he and Washington soon switched places.

¶5.    When an ambulance arrived minutes later, Lieutenant English rushed Zoe to EMT Andrew Aycox and paramedic Joey Sanders. As Sanders placed leads on Zoe's chest to monitor the electrical activity of her heart, he noticed bruising on her abdomen. Sanders later testified that the bruising appeared to be the product of a "significant amount" of blunt-force trauma. According to Sanders, it was the "type of injury that you would see in high[-]speed

. . . car accidents." Gray told Sanders that he had pressed on Zoe's abdomen to relieve constipation, and later in an attempt to perform CPR. Because Zoe's injuries did not match Gray's version of events, Sanders refused to let Gray ride in the ambulance. Washington rode in the ambulance and assisted with CPR while Zoe was rushed to Baptist Hospital a few miles away.

¶6.     Emergency-room physicians Dr. Paul Zoog and Dr. Paul Petty were on duty when Zoe arrived. She was still in cardiac arrest. Dr. Zoog and Dr. Petty both noticed bruising on her abdomen. She also had bruises on her forehead, cheek, and the back of her head. Additionally, there were lacerations in her mouth, and her maxillary frenulum was torn.[1] Through the efforts of personnel at Baptist Hospital, Zoe's heart began to beat on its own. Approximately thirty-four minutes after she arrived, Zoe was rushed to Batson Children's Hospital at the University of Mississippi Medical Center (UMMC).[2]

¶7.     Dr. Nancy Wahl and Dr. Sarah Sterling treated Zoe at Batson Children's Hospital. Dr. Wahl and Dr. Sterling both noticed bruising on her abdomen. Dr. Wahl also compared Zoe's injuries to the aftermath of "a motor[-]vehicle collision." A CT scan of Zoe's abdomen revealed that she was bleeding internally from multiple liver lacerations and the area around her duodenum. Zoe had lost approximately one-half of her entire blood volume.

---

[1] Dr. Zoog later testified that the maxillary frenulum is the "little piece of tissue that [attaches the] upper lip to [the] upper gum . . . between [one's] two front teeth."

[2] Dr. Zoog testified that Zoe was transferred to Batson Children's Hospital because, unlike Baptist Hospital, it has a pediatric intensive-care unit. Zoe was initially taken to Baptist Hospital because it was the closer to Brown's apartment, and was the first option available for emergency treatment.

3

According to Dr. Wahl, Zoe was bleeding internally as fast as they could give her transfusions. During the eighty minutes the personnel at Batson Children's Hospital treated Zoe, she received transfusions amounting to almost her entire blood volume. Despite their efforts, Zoe's blood pressure was never high enough to treat her surgically. Zoe died at 4:29 p.m.

¶8. At that time, Gray was a detective with the Jackson Police Department. A number of his fellow officers went to the hospital in either a personal or professional capacity. Five officers later testified that while they were at Batson Children's Hospital, Gray said that he had killed Zoe by pressing on her stomach to relieve her constipation and improperly performing CPR.

¶9. Later that day, Gray was transported to the police department for questioning. Gray waived his right to remain silent and gave a statement. Gray was later indicted for capital murder, which was elevated based on the allegation of felony child abuse. Gray pled not guilty. Gray's trial attorneys and the prosecution exchanged numerous volleys of pretrial motions, which we will address as necessary below.

¶10. Gray's trial began on February 11, 2013. Jury selection lasted that entire day. The prosecution called twenty-six witnesses over four days. Briefly summarized, numerous witnesses testified that the blunt-force trauma to Zoe's abdomen lacerated her liver and essentially tore her pancreas in half. A number of witnesses also testified that Zoe's injuries were the product of child abuse, and they were not caused by massaging her stomach or improperly performing CPR by pressing on her abdomen. The prosecution called five

4

physicians as expert witnesses who testified that without medical intervention, Zoe would have died less than an hour after sustaining her fatal injuries. The prosecution rested its case-in-chief on February 19, 2013.

¶11. Gray testified in his own defense. Gray claimed that he was not responsible for Zoe's fatal injuries. His defense theory was to blame Brown for Zoe's fatal injuries. According to Gray, Brown had spanked Zoe before she went to church. Gray testified that Zoe behaved unusually from the time that they woke up after Brown left. He claimed that Zoe was limp, she would not stand up or walk, she stared into space, and she would not eat or drink. When she started behaving as though she was constipated, he rubbed her abdomen. He claimed that when she stopped breathing, he tried to perform CPR by pressing on her abdomen.

¶12. Gray also testified that the firefighters who responded to his 911 call never performed CPR on Zoe after they arrived, and all three who testified otherwise were lying. According to Gray, they simply watched him push on Zoe's abdomen and suggested that he hold her nose and breathe less forcefully into her mouth. Gray claimed that he carried Zoe to the ambulance, and the emergency responders acted casually while he continued to press on her stomach.

¶13. Gray also testified that Zoe did not have any bruising in his care or at any time before she arrived at Batson Children's Hospital. According to Gray, "[s]omething happened to [Zoe] while she . . . was being treated." Gray claimed that the police officers who testified that he had said that he killed Zoe were all either lying or testifying based on rumors that they had heard from others.

¶14. Gray called Dr. Steven Hayne as an expert witness.[3] Essentially, Dr. Hayne testified that Zoe could have lived up to five hours without medical intervention after she received her fatal injuries. In other words, Dr. Hayne's testimony indicated that Zoe would have been in Brown's care at the time she sustained her fatal injuries. Dr. Hayne based his testimony on the levels of certain biochemical markers in Zoe's tissues, rather than the rate at which she was bleeding internally, which he characterized as uncertain based on the undefined characteristics of the liver lacerations.

¶15. The prosecution called two rebuttal witnesses. Brown said that she did not spank Zoe the morning that she died. The prosecution also recalled Dr. Scott Benton,[4] who had testified during the prosecution's case-in-chief. During his rebuttal testimony, Dr. Benton refuted Dr. Hayne's testimony that Zoe sustained her fatal injuries at approximately 9:30 or 10:00 a.m. Dr. Benton reiterated his opinion that Zoe would have died within minutes of her fatal injuries without medical intervention. He also refuted the methodology by which Dr. Hayne arrived at his opinion. That is, Dr. Benton testified that concentrations of various substances in the body cannot be used to extrapolate the time of an injury. Quoting a 2012 article in a medical journal, Dr. Benton explained that hopefully "some day, someone will discover a suitable chemical biomarker within the human body whose concentrations can be quantitatively tracked over time to . . . predict the time of death." However, he testified that

---

[3] Dr. Hayne testified that he was not being compensated for his examination of Zoe's records or his testimony.

[4] Dr. Benton was an associate professor of pediatrics and chief of the division of forensic medicine at UMMC. He was also the medical director of the Children's Justice Center.

there is no current medical "science that justifies the use of biochemical markers . . . to backdate [a] death." He further explained that Dr. Hayne's methodology was inaccurate because there is no precise way to extrapolate the time of an injury based on the number of white blood cells in human tissue. Finally, Dr. Benton testified that Gray's testimony was inconsistent with Dr. Hayne's because if Zoe suffered the fatal injuries at 9:30 or 10:00 a.m., and Gray had pressed on her abdomen, Zoe would have been "screaming in pain," and Gray did not testify that she had done so.

¶16. On February 21, 2013, the jury found Gray guilty of capital murder. A week later, the circuit court conducted a sentencing hearing and sentenced Gray to life without the possibility of parole.[5] Following his unsuccessful motion for a judgment notwithstanding the verdict (JNOV), Gray appeals.

¶17. On appeal, Gray's appointed attorney argues that Gray received ineffective assistance of counsel at trial for multiple reasons, including that his trial attorneys failed to adequately interview witnesses, failed to request an accident instruction, and failed to request a manslaughter instruction. Gray has also filed a pro se supplemental brief. Gray lists twenty-four issues in his supplemental brief, but based on the substance of his arguments and the fact that they often overlap, we are able to address them in fifteen issues.

**ANALYSIS**

**I.      Assistance of Counsel**

¶18. Gray argues that he received ineffective assistance of counsel because his trial

---

[5] Based on Gray's employment history as a law-enforcement officer, the circuit court requested that MDOC place Gray in protective custody during his incarceration.

attorneys were not able to interview all of the prosecution's witnesses. During a pretrial hearing, the prosecution mentioned that Gray's trial attorneys had not interviewed six witnesses. Gray's trial attorneys explained that the witnesses refused to talk to them.

¶19. At trial, one of Gray's trial attorneys cross-examined Lieutenant English, who testified that he had not previously spoken to either of Gray's trial attorneys. There were similar statements during cross-examination of the next three witnesses for the prosecution. Additionally, Gray's trial attorneys had not previously spoken to Zoe's pediatrician, Dr. Geraldine Chaney.

¶20. Gray also claims that one of his trial attorneys improperly gave a witness an opportunity to explain why his testimony was different than the events he described in a report, and his cross-examination of prosecution witnesses resulted in answers that undermined Gray's case. Additionally, Gray argues that one of his trial attorneys was ineffective because he asked questions that were fruitless, he asked questions without knowing what the witnesses would say, and he was not adequately prepared to cross-examine witnesses. Gray also claims that one of his trial attorneys called Dr. Hayne, who was not an effective witness. Finally, Gray argues that his trial attorneys were ineffective because they did not request an accident instruction, and their frequent objections became tedious.

¶21. "The benchmark for judging any claim of ineffectiveness of counsel must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Foster v. State*, 687 So. 2d 1124, 1129 (Miss. 1996) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). "The test

8

is two pronged: The defendant must demonstrate that his counsel's performance was deficient, and that the deficiency prejudiced the defense of the case." *Id*. (citations omitted).

¶22.    "Generally, ineffective[-]assistance claims are more appropriately brought during post[]conviction proceedings." *Bateman v. State*, 125 So. 3d 616, 633 (¶60) (Miss. 2013). The rationale for this is based on the fact that on direct appeal, an appellate court is limited to the record in the trial court, "and there may be instances in which insufficient evidence exists within the record to address the claim adequately." *Archer v. State*, 986 So. 2d 951, 955 (¶15) (Miss. 2008).  "This Court will rule on the merits on the rare occasions where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *McClendon v. State*, 152 So. 3d 1189, 1192 (¶12) (Miss. Ct. App. 2014).

¶23.    The record before us does not affirmatively show ineffectiveness of constitutional dimensions, and the parties have not stipulated that the record is adequate to allow this Court to rule on the issue without considering the circuit court's findings of fact.  "In such a case, the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a petition for post[]conviction relief." *Archer*, 986 So. 2d at 955 (¶15). Consequently, Gray is free to seek postconviction relief, if he chooses to do so.

## II.    Subpoena Duces Tecum

¶24.    According to Gray, the circuit court erred when it granted the prosecution's motion to quash the subpoena duces tecum that he had served on Brown.  Through the subpoena

duces tecum, Gray sought to have Brown appear at his trial attorney's office and provide twenty categories of material.[6]  The circuit court granted the prosecution's motion to quash the subpoena duces tecum because "it violated Rule 2.01 of the" Uniform Rules of Circuit and County Court.  An appellate court "applies a de novo standard of review to questions of law, such as whether the trial court erred in granting a motion to quash a subpoena." *Miss. Dep't. of Rev. v. Pikco Finance Inc.*, 97 So. 3d 1203, 1205 (¶3) (Miss. 2012).

¶25.    Rule 2.01(B) states:

> A subpoena in a criminal case may, without a motion or hearing, require the production of books, papers, documents or other objects at the date, time and place *at which the trial, hearing or proceeding at which these items are to be offered in evidence is scheduled to take place*.

(Emphasis added).  Additionally, Rule 2.01(C)(1) provides:

> No subpoena in a criminal case may require the production of books, papers, documents or other objects at a date and time or place other than the date, time and place at which the trial, hearing or proceeding at which these items are to be offered in evidence is scheduled to take place, unless the court has entered an order pursuant to this rule authorizing the issuance of such subpoena.

The subpoena duces tecum at issue commanded Brown to appear at Gray's trial attorney's office and produce the material at issue.  The circuit court had not entered an order authorizing the subpoena duces tecum.  We find no merit to this issue.

### III.    Life Insurance

¶26.    In the subpoena duces tecum discussed in the previous issue, Gray requested the

---

[6]  Among other things, the material Gray sought through the subpoena duces tecum included Brown's cellular phone, computers, emails, all pictures of Zoe, Brown's medical records, insurance policies, educational certificates, phone records, employment records, and Zoe's daycare documents.

disclosure of all material regarding any life insurance that Brown "sought on the life of" Zoe. The prosecution filed a pretrial motion to suppress evidence of the two life-insurance policies on Zoe: one with a $15,000 benefit, and the other with a $25,000 benefit. Brown was the sole beneficiary under each policy.[7] The prosecution argued that the life-insurance policies were irrelevant. The circuit court took the matter under advisement until Brown could be proffered regarding the policies.

¶27. During the proffer, Brown testified that she purchased the $25,000 whole-life policy ten days after Zoe was born. Brown described the $15,000 policy as a "college fund" that also would pay a death benefit, if necessary. Brown testified that she contacted State Farm regarding the $25,000 policy on the day after Zoe died. Brown further testified as follows:

> I can't remember who exactly I spoke with, but they told me that Zoe had to be moved from the hospital and I needed to decide which funeral home I wanted her to go to. So I called [my insurance agent] to see if I needed like a policy number, or what did I need in order to give to the funeral home so they would be able to come and pick up Zoe.

Brown explained that she did not have enough money to pay for Zoe's funeral without the benefit from the life-insurance policy. After the proffer, the circuit court held that Gray would be allowed to introduce evidence of the two policies and the time that Brown contacted State Farm regarding the $25,000 policy. Gray's trial attorney subsequently cross-examined Brown regarding the insurance policies. On appeal, Gray claims the prosecution withheld exculpatory material by not disclosing evidence of the life-insurance policies during discovery. "In reviewing rulings of a trial court regarding matters of evidence, relevancy and

---

[7] The $15,000 policy was through Gerber Life Insurance. The $25,000 policy was through State Farm.

discovery violations, the standard of review is abuse of discretion." *Montgomery v. State*, 891 So. 2d 179, 182 (¶6) (Miss. 2004).

¶28. Gray argues that the prosecution violated its obligation to disclose exculpatory material as required by *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. The Supreme Court later clarified that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*.

¶29. Even assuming that the policies are considered exculpatory toward Gray and the prosecution was obligated to disclose them during discovery, Gray cannot demonstrate a reasonable probability that the outcome of the trial would have been different if the prosecution would have disclosed the policies during discovery. "[T]he question is whether there is a reasonable probability that the verdict would have been different but for governmental evidentiary suppression which undermines confidence in the outcome of the trial." *Montgomery*, 891 So. 2d at 183 (¶8). Gray sought to create the inference that Brown was financially motivated to kill Zoe because she was the beneficiary of the policies. He succeeded. The jury heard Brown's testimony that there were two life-insurance policies on

12

Zoe, she was the beneficiary of both policies, and she submitted a claim on the $25,000 policy on the day after Zoe died. The jury simply chose not to believe Gray's theory. There is no merit to this issue.

## IV. Gray's Prior Statements

¶30. On January 30, 2013, Gray filed a pretrial motion to suppress prior statements that he "purportedly made in or about January or February . . . 2011, during the pe[nd]ency of a paternity and child support action . . . ." Gray elaborated that in the statements, he "purportedly referred to [Zoe] as an 'ugly bastard' and otherwise den[ied] that he was [her] biological father . . . ." Gray claimed that he had never made the statements at issue, which were introduced as evidence during a paternity and child-support hearing that he did not attend.[8] According to Gray, the statements were "irrelevant, highly prejudicial[,] and would be solely offered to inflame the jury and otherwise present inadmissible character evidence." He also argued that because the statements allegedly occurred nine months prior to Zoe's death, the statements were too remote in time to have any probative value regarding his relationship with Zoe.

¶31. The circuit court heard Gray's motion to suppress the prior statements on February 5, 2013. During the hearing, the prosecution argued that the statements were relevant and admissible to show that Gray did not want to be involved with Zoe.[9] Gray's trial attorney

---

[8] Gray did not deny that he received notice of the paternity and child-support hearing. He later stated that he did not attend it because of a job-related interview.

[9] Among other things, Gray purportedly said that he had "no emotional ties" to Zoe, and he was "completely flat towards her."

noted that the statements also showed that Gray later sought a relationship with Zoe based on the following statement: "I think of her and I want to change where we are today and be a family to the both of you and her alone." Gray's trial attorney further pointed out that Gray had later moved into Brown's apartment, and Brown had never accused Gray of abusing Zoe. The circuit court held that the statements, which were approximately nine to ten months before Zoe's death, were not too remote in time to have any probative value. The circuit court also held that the statements were "relevant to the issue of [Gray]'s motivation." Consequently, the circuit court denied Gray's motion to suppress the prior statements.

¶32. For the first time on appeal, Gray claims the prior statements were not properly authenticated. Gray is procedurally barred from raising this issue. *Berry v. State*, 75 So. 3d 1053, 1060 (¶24) (Miss. Ct. App. 2011). "A contemporaneous objection is required in order to preserve an issue for appeal." *Id*. (citing *Davis v. State*, 43 So. 3d 1116, 1126 (¶35) (Miss. 2010)). An objection on particular grounds at trial "waives all other grounds for objection on appeal." *Carter v. State*, 722 So. 2d 1258, 1261 (¶13) (Miss. 1998).

### V. Pictures of Zoe

¶33. In this issue, Gray claims the circuit court erred when it allowed the prosecution to introduce pictures of Zoe that were taken after she died. Officer Robert Bufkin took most of the pictures at issue while Zoe was at UMMC. The remainder of the pictures were taken during Zoe's autopsy. Gray claims that the pictures had no probative value because Dr. Benton had illegally disturbed Zoe's body. Additionally, Gray claims that the pictures should have been suppressed based on the prejudicial effect of their gruesome nature.

14

¶34.    "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403. "[A] trial court must conduct a two-part test to determine whether a crime victim's photograph is admissible." *Bonds v. State*, 138 So. 3d 914, 918 (¶8) (Miss. 2014). "First, the trial court must determine whether the proof is absolute or in doubt as to identity of the guilty party. Secondly, it must be determined whether the photographs are necessary evidence or simply a ploy by the prosecutor to arouse the passion and prejudice of the jury." *Id*. "Such photographs should not be admitted where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established." *Id*.

¶35.    According to Gray, "[p]hotos taken during the autopsy in regard[] to bruising about the deceased and the cut inside the deceased['s] lip were all products of [Dr.] Benton's disturbing the body." First and foremost, there was no evidence that bruising can occur after death. Additionally, Gray's claim is contradicted by Dr. Benton's testimony on cross-examination that he "did not remove [Zoe] from the gurney" that she was on. He elaborated as follows: "Did we pick up an arm and look at [it] and look at things that we could see externally visible on the child[? Y]es. The nurses and I looked at the child from head to toe." There was no evidence that any of Zoe's injuries were caused after her death. By extension, there was no evidence that Dr. Benton caused any of Zoe's injuries. It follows that the probative value of the pictures was not diminished by the acts of anyone who attempted to resuscitate Zoe or documented her injuries after she died.

15

¶36. Without question, all of the pictures at issue had some degree of prejudicial effect. Pictures of a recently deceased thirteen-month-old baby are naturally disturbing. That effect is multiplied when the pictures depict numerous external injuries. And the reaction is even further exacerbated by pictures of an infant's autopsy. If our analysis solely involved determining whether the pictures were prejudicial, then we would go no further. However, the circuit court was obligated to weigh the probative value of the pictures against their "prejudicial potential to arouse the passions of the jury." *Bonds*, 138 So. 3d at 919 (¶13).

¶37. The pictures were helpful to the jury because they were able to see Zoe's injuries. Without the pictures, the jury would have been left to imagine the frequency and severity of bruising on Zoe's abdomen, face, head, and inside her upper lip. The picture of Zoe's lacerated frenulum clarified the degree of the laceration and its precise location. The pictures taken during Zoe's autopsy were the most accurate way for the jury to comprehend the severity of Zoe's liver lacerations and the force that would have been necessary to cause them. The same is true regarding Zoe's "transected" pancreas and the damage to her bowel mesentary. Finally, the autopsy pictures helped the jury to understand the volume of blood that Zoe lost due to internal bleeding.

¶38. A critical variable in this case was the time that Zoe could have survived without medical intervention after receiving her fatal injuries. The prosecution's experts opined that Zoe would have died within minutes, and certainly no later than an hour. Gray's expert opined that Zoe would have survived for approximately five hours. The pictures helped the jury resolve that contradictory testimony. The circuit court acted within its discretion when

16

it declined to suppress the pictures at issue. *See id*. It follows that we find no merit to this issue.

## VI. Expert Testimony

¶39. This issue stems from Gray's efforts to prevent the prosecution's expert witnesses from rebutting Dr. Hayne's testimony that Zoe sustained her fatal injuries approximately five hours before medical intervention was necessary. On January 30, 2013, Gray moved to suppress any expert testimony from the prosecution's expert witnesses "regarding the time or duration between infliction of wounds or injuries to [Zoe] and [her] death[.]" Gray argued that the prosecution's experts had not provided any reports specifying the time that Zoe sustained her fatal injuries.

¶40. The next day, Gray served the prosecution with a letter written by Dr. Hayne. Within the letter, Dr. Hayne opined that Zoe's injuries occurred approximately five hours before she died, which meant that Zoe would not have been in Gray's exclusive care, and he could not have caused her fatal injuries. According to Dr. Hayne's letter, he arrived at his opinion based on "blood[-]chemistry results, microscopic findings, clinical history, and hematological and chemistry values." That was the prosecution's first notice that there would be an issue about the time that Zoe suffered her fatal injuries. The prosecution responded by demanding that Dr. Hayne elaborate regarding his methodology.

¶41. On February 5, 2013, the circuit court heard several motions that Gray and the prosecution had filed. Gray's trial attorneys reiterated their position that the prosecution had provided insufficient information regarding its experts' opinions as to when Zoe's fatal

17

injuries occurred, and they reasoned that the prosecution's experts should not be allowed to testify on the subject. Gray's trial attorneys also argued that the prosecution's experts were not qualified to testify on the subject because, aside from Dr. Barnhart, they were not forensic pathologists. As for Dr. Barnhart, Gray's trial attorneys claimed that she was only "marginally qualified" because she had been board certified for a relatively short time.

¶42. The prosecution noted that it had not disclosed its experts' opinions regarding when Zoe's injuries had occurred because that first became an issue when Gray provided Dr. Hayne's report six days earlier. The prosecution further noted that it needed time to contact its experts and obtain additional information.[10] The circuit court ordered Gray and the prosecution to supplement discovery with additional information no later than February 7, 2013. On that date, the prosecution complied and provided Gray with additional information regarding the anticipated testimony of its seven proposed expert witnesses.

¶43. On February 8, 2013, Gray filed a supplemental motion to prevent the prosecution's experts from testifying regarding the time that Zoe's fatal injuries occurred. Gray claimed that the prosecution's supplemental disclosures did not provide sufficient information. Gray again claimed that none of the prosecution's proposed expert witnesses were qualified to offer expert testimony about the time that Zoe's fatal injuries occurred. At a hearing that same day, Gray's trial attorneys argued that the prosecution's proposed experts had not "offered any scientific facts or literature or peer review or tests that they have actually

---

[10] The prosecution explained that it had contacted Dr. Sterling and Dr. Barnhart, but Dr. Petty was at a seminar in California, and Dr. Benton was involved in a trial. The prosecution planned to meet with Dr. Wahl later that day.

18

performed" to support their conclusion that Zoe's fatal injuries occurred less than an hour before medical intervention became necessary. The circuit court took Gray's motions under advisement. After addressing the issues as the prosecution called its expert witnesses, the circuit court found that they were qualified to testify that Zoe's fatal injuries occurred between "minutes" and an hour from the time that Gray called 911.

¶44. Next, Gray claims that the prosecution's medical experts should not have been allowed to testify regarding the time that Zoe's fatal injuries occurred. He claims that the prosecution did not disclose their anticipated testimony in a timely manner. He also claims that the circuit court failed to conduct an adequate hearing under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 593 (1993). Finally, Gray claims that Dr. Benton was not qualified to testify regarding the time that Zoe's injuries occurred.

### A. Disclosure

¶45. Gray claims the prosecution's experts should not have been allowed to testify because the prosecution did not provide his trial attorneys with timely or adequate reports regarding their anticipated testimony. Essentially, Gray argues that the prosecution committed a discovery violation, so its experts should not have been allowed to testify regarding the time that Zoe suffered her fatal injuries. Gray never requested a continuance. Although we do not find that the prosecution committed a discovery violation, even if we found that there was one, "the failure to request a continuance constitutes a waiver of the discovery violation." *Murray v. State*, 20 So. 3d 739, 743 (¶13) (Miss. Ct. App. 2009). This issue is procedurally barred.

19

### B. *Daubert* Hearing

¶46. Gray claims the circuit court erred because it did not conduct a *Daubert* hearing regarding the prosecution's expert witnesses. We are mindful that "[t]he admission of expert testimony is within the discretion of the trial court." *Bateman*, 125 So. 3d at 625 (¶28). We "will not reverse the trial court's decision to admit expert testimony unless the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id*.

¶47. Gray appears to misunderstand what is required. The Mississippi Supreme Court has unequivocally stated that a trial court "is not required to hold an actual hearing to comply with *Daubert*." *Edmonds v. State*, 955 So. 2d 787, 792 (¶10) (Miss. 2007). "[T]he basic requirement under the law is that the parties have an opportunity to be heard before the [trial] court makes its decision." *Id*. Based on the logistics involved with the prosecution calling multiple expert witnesses, the circuit court addressed Gray's *Daubert* claims outside of the jury's presence at the time that the prosecution called each of its experts.

¶48. Rule 702 of the Mississippi Rules of Evidence governs the admissibility of expert testimony. It allows a witness qualified as an expert to testify in the form of an opinion if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case." M.R.E. 702. The Mississippi Supreme Court has adopted the United States Supreme Court's standard for judging the admissibility of expert testimony set forth in *Daubert* and later modified by *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (¶23) (Miss. 2003). "Expert

testimony must be relevant and reliable to be admissible." *Bateman*, 125 So. 3d at 625 (¶29). Additionally, "the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue." *Id*. at 626 (¶29).

¶49. In multiple issues, Gray claims that the circuit court should not have allowed any of the prosecution's expert witnesses to testify regarding the time that Zoe could have survived after sustaining her fatal injuries. Gray repeatedly argues that the prosecution's experts "collectively failed to point to any medical authority in support of their opinions," and "failed to substantiate their opinions and testimony based upon medical facts and properly supported medical peer review and authoritative medical support."

¶50. *Daubert* does not state that expert testimony is per se inadmissible if the substance of the testimony has never been the subject of peer review. *Kumho*, 526 U.S. at 151. The subject matter of the testimony at issue in this case illustrates exactly why peer review is not required in all instances. Gray takes issue with the prosecution's experts who testified that without medical intervention, Zoe would have lived for an hour or less after her fatal injuries occurred. As Dr. Benton explained during his proffered cross-examination testimony, "these are experiential issues . . . . [W]e can't go beating kids in the abdomen and finding out what happens . . . . [W]e don't have a reproducible[,] testable event where we beat the child or injure the child [and] see how long it takes for them to bleed." Thus, the absence of peer-review articles to support the prosecution's experts does not render their expert opinions inadmissible. The prosecution's expert physicians explained that their opinions were based

21

on their education, experience, and training. Based on the subject matter of the testimony at issue – the time that a thirteen-month-old child could survive after sustaining fatal internal injuries – it was within the circuit court's discretion to allow the expert testimony. We find no merit to this issue.

### C.    Qualifications

¶51.    According to Gray, Dr. Benton's testimony exceeded his qualifications. However, Gray does not elaborate regarding which portion of Dr. Benton's testimony allegedly exceeded his qualifications. On appeal, errors in the admission of evidence, including expert testimony, are reviewed for an abuse of discretion. *Parvin v. State*, 113 So. 3d 1243, 1246 (¶12) (Miss. 2013). Unless the circuit court's decision was arbitrary and clearly erroneous, the decision will stand. *Galloway v. State*, 122 So. 3d 614, 632 (¶27) (Miss. 2013).

¶52.    Expert testimony is governed by Rule 702, which states that a properly qualified witness may testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The opinions given "must rise above mere speculation" and "be [found] relevant and reliable." *Parvin*, 113 So. 3d at 1247 (¶14) (quoting *Williams v. State*, 35 So. 3d 480, 486 (¶19) (Miss. 2010)); *Ross v. State*, 954 So. 2d 968, 996 (¶57) (Miss. 2007). "Testimony is relevant if it will assist the trier of fact in understanding or determining a fact at issue." *Ross*, 954 So. 2d at 996 (¶57). Testimony is reliable if it is "based on the methods and procedures of science, and not merely on subjective beliefs or unsupported speculation." *Id*.

22

¶53. Dr. Benton testified that he was an "associate professor of pediatrics," "chief of the division of forensic medicine," and "the medical director of the Children's Justice Center." Dr. Benton also noted that he had testified in numerous cases as an expert in pediatric forensic medicine. Although Dr. Benton's testimony was certainly prejudicial to Gray's defense that Zoe sustained her fatal injuries approximately five hours before she died, we do not find that the circuit court abused its discretion when it held that Dr. Benton was qualified to testify as an expert in pediatric forensic medicine. There is no merit to this issue.

## VII. Evidence of Brown's Mental Health

¶54. In this issue, Gray claims he should have been allowed to obtain Brown's mental-health records and introduce them into evidence. Gray sought to introduce evidence that Zoe's death was due to Brown's mental instability. As mentioned above, we will not disturb the circuit court's decisions regarding the admissibility of evidence unless the circuit court abused its discretion. *Montgomery*, 891 So. 2d at 182 (¶6).

¶55. On January 31, 2013, Gray filed a motion for disclosure of Brown's mental-health records. Within the motion, Gray claimed that Brown's phone records indicated that she had communicated with a mental-health counselor on the day that Zoe died. Gray also claimed that Brown "has a history of mental and emotional problems." Gray further alleged that because Brown was from Meridian, Mississippi, "information suggests that she has sought therapy at Weems Mental Health Center."

¶56. During a subsequent hearing, it became clear that there was no specific indication that Brown had ever suffered from mental-health problems. Although Brown's phone records

indicated that she had spoken with someone from the Boston, Massachusetts area on the day that Zoe had died, there was no evidence regarding the substance of the communication. Without any more specific indication that Brown had been treated for mental-health issues, the circuit court stated that "it just sounds like there's a serious fishing expedition going on to find out what may be in mental[-]health records," and he needed to hear "something that would suggest that there's other than just an effort to root around in Ms. Brown's record to see if there's something that may be useful" to Gray.

¶57. At trial, Gray's trial attorney elicited testimony from Brown during a proffer. Brown stated that she had sought some unspecified treatment "years ago" regarding her relationship with her mother, and she had sought grief counseling after Zoe died. Otherwise, she had not sought any treatment for her mental health. She also clarified that she had not spoken with a mental-health counselor from Boston on the day Zoe died. Brown explained that the Boston phone number belonged to a friend who happened to be a public-health advisor for teen pregnancy. Following the proffer, the circuit court held that Brown's previous treatment for grief and her relationship with her mother were irrelevant, and Gray was prohibited from eliciting testimony on the subjects.

¶58. Rule 401 of the Mississippi Rule of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." It is unclear exactly when Brown sought counseling or some other form of treatment based on her relationship with her mother. The record merely states that it was

24

"years" before Gray's trial. Brown was not asked to elaborate during the proffer. On appeal, Gray does not clarify how Brown's previous treatment would be relevant to his trial for capital murder. There is no evidence that Brown was mentally unstable, violent, or that she had ever been hospitalized or medicated for a mental-health issue. There is no merit to this issue.

### VIII. Character Evidence

¶59. Prior to Gray's trial, the State moved to prohibit testimony from three of Gray's prospective witnesses: Tamara Milliken, Yolanda Davis, and Morgan Washington. Gray is the father of one of Davis's children. The defense planned to call Davis to testify regarding the manner in which Gray had disciplined their child. Milliken was the former deputy chief of police who had supervised Gray during their time with the Jackson Police Department. And although Gray was not Washington's biological father, he had treated her as his own child. The prosecution argued that their anticipated character testimonies were irrelevant and inappropriate character evidence. The circuit court took the prosecution's motion under advisement, and opted to hear proffers before ruling on the motion.

¶60. At trial, Gray's trial attorneys chose not to call Washington as a witness or proffer her testimony. During Davis's proffer, she testified that Gray had never used corporal punishment to discipline their child. She also testified that she did not know that Gray was romantically involved with Brown, or that they had a child. The circuit court held that Davis's testimony was not relevant, and whatever probative value her testimony had was substantially outweighed by the danger of misleading the jury, confusion of the issues, and

the unfair prejudice her testimony would produce. Consequently, the circuit court granted the prosecution's motion to exclude Davis's testimony.

¶61. During Milliken's proffer, she testified that she had been the deputy chief of special operations when Zoe died, and she was Gray's supervisor at the Jackson Police Department. According to Milliken, she had been at a cookout when she heard that Gray had been taken in for questioning. Although she had been drinking, Milliken went to the Jackson Police Department and had a "heated discussion" with the deputy chief in charge of major investigations, because no one would tell her what was going on with Gray's investigation. As a result of the "heated discussion," Milliken resigned.

¶62. The circuit court held that Milliken's proffered testimony was irrelevant, and its probative value was outweighed by the likelihood of confusing and misleading the jury. Citing Rule 403, the circuit court granted the prosecution's motion to exclude Milliken's testimony.

¶63. Gray claims the circuit court should have allowed Milliken to testify regarding his "profession[al] character." He further argues that Davis should have been allowed to testify regarding his "private character." To support his claims, Gray cites Rule 608(a)(1) of the Mississippi Rules of Evidence and *Hall v. State*, 490 So. 2d 858, 859 (Miss. 1986), for the general principle that it is reversible error to prohibit a defendant from calling witnesses and questioning them before a jury. However, Gray cites no authority that supports his specific claims that Milliken and Davis should have been allowed to testify regarding his personal and professional character. Arguments advanced on appeal must "contain the contentions

26

of the appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." M.R.A.P. 28(a)(6). "Failure to comply with [Rule] 28(a)(6) renders an argument procedurally barred." *Rogers v. State*, 994 So. 2d 792, 800 (¶31) (Miss. Ct. App. 2008). Therefore, this issue is procedurally barred.

### IX. Circumstantial-Evidence Instruction

¶64. Gray claims the circuit court should have given a circumstantial-evidence instruction. However, Gray did not request one. Consequently, Gray is procedurally barred from raising this issue for the first time on appeal. *See McCoy v. State*, 147 So. 3d 333, 351 (¶48) (Miss. 2014).

### X. Sufficiency of the Evidence

¶65. Next, Gray argues that there was insufficient evidence to convict him of capital murder because there was no evidence that he abused Zoe.[11] In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Nolan v. State*, 61 So. 3d 887, 893 (¶24) (Miss. 2011) (quoting *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005)). All credible evidence

---

[11] This issue encompasses Gray's arguments that the circuit court erred when it instructed the jury regarding the elements of felony child abuse and capital murder. In separate issues, Gray submits that there was insufficient evidence to support the instructions. Stated differently, Gray argues that the circuit court should have given a peremptory instruction that he was not guilty. We review the sufficiency of the evidence based on the last occasion that the challenge was raised in the circuit court. *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). Gray last challenged the sufficiency of the evidence in his motion for a JNOV.

consistent with the defendant's guilt will be accepted as true, together with all favorable inferences that may be reasonably drawn from the evidence. *Robinson v. State*, 940 So. 2d 235, 240 (¶13) (Miss. 2006) (citing *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)). The evidence will be considered in the "light most favorable to the State." *Id*.

¶66.    Numerous physicians, including Dr. Hayne, testified that Zoe's death was the result of child abuse. There was evidence that Zoe had multiple contusions on her head and bruises on her face. Her maxillary frenulum was torn, which was consistent with a shearing force caused by something hitting her in the side of her face. She also had bruises on the inside of her lip, which were likely caused when something hit her in the mouth and the inside of her lip impacted her teeth. The jury heard numerous witnesses testify regarding the substantial bruising on Zoe's abdomen, which were caused by "multiple impacts" of blunt-force trauma. The force that caused her abdominal injuries was compared to being kicked by a horse, falling from a height, or being involved in a "motor[-]vehicle collision." The force was so significant that it lacerated her liver, and her pancreas was "basically torn in half" when it impacted her spine.

¶67.    Gray initially claimed that he had merely massaged Zoe's abdomen to relieve her constipation before she lost consciousness. He testified that Brown admitted that she had caused Zoe's fatal injuries, but Brown disputed that. The testimonies of prosecution's expert witnesses also supported the conclusion that Zoe's fatal injuries occurred while she was in Gray's exclusive care. Additionally, Gray testified that he had improperly performed CPR, and emergency responders did not stop him. However, that was contradictory to the

28

testimony of three firefighters and the ambulance crew. And Dr. Hayne's expert testimony suggested that Zoe's fatal injuries occurred when she was in Brown's care, but the prosecution's experts disagreed and clearly explained the flaws in Dr. Hayne's methodology. The jury is responsible for resolving conflicts in the evidence and the credibility of witnesses. *Brown v. State*, 796 So. 2d 223, 227 (¶12) (Miss. 2001). The jury resolved the conflicting evidence in the prosecution's favor. We find no merit to this issue.

### XI.    Weight of the Evidence

¶68.    Gray claims the jury's verdict is contrary to the overwhelming weight of the evidence. According to Gray, the prosecution failed to prove that he abused Zoe. An appellate court will only disturb a verdict based on the weight of the evidence "when [the verdict] is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶18). As we review this issue, we weigh the evidence in the light most favorable to the verdict. *Id.*

¶69.    We do not find that allowing the verdict to stand would sanction an unconscionable injustice. As mentioned above, the jury is responsible for resolving conflicts in the evidence and the credibility of witnesses. *Brown*, 796 So. 2d at 227 (¶12). Furthermore, "[f]actual disputes are properly resolved by a jury and do not mandate a new trial." *Ealey v. State*, 158 So. 3d 283, 293 (¶31) (Miss. 2015). This issue has no merit.

### XII.    Prosecutorial Misconduct

¶70.    In this issue, Gray claims the prosecution knowingly presented false testimony, but there is no support for his claim. Additionally, Gray claims the prosecution made

inappropriate comments during its closing argument. However, Gray did not object at any time during the prosecution's closing argument. As an appellate court, we have no original jurisdiction to review this issue. *See Milano v. State*, 790 So. 2d 179, 189 (¶47) (Miss. 2001) (holding that a prosecutorial-misconduct claim was procedurally barred when raised for the first time on appeal). Accordingly, this issue is procedurally barred. *Davis v. State*, 660 So. 2d 1228, 1255 (Miss. 1995).

### XIII. Comments by the Circuit Court

¶71. Next, Gray claims the circuit court committed reversible error by admonishing his trial attorneys to "move along." Gray also complains that the circuit court "hurried [his attorneys] to finish [their] examinations when it was obvious [that they] had not completed examinations of witnesses." According to Gray the circuit court "simply wanted to conclude the trial." Finally, Gray argues that he was prejudiced by the circuit court's "countenance toward Gray, his counsel, his cross-examinations[,] and evidence of innocence . . . ."

¶72. As stated previously, evidentiary matters are subject to the circuit court's discretion. *Zoerner v. State*, 725 So. 2d 811, 813 (¶7) (Miss. 1998). Rule 611(a)(2) of the Mississippi Rules of Evidence states that a circuit court "shall exercise reasonable control over the mode . . . of interrogating witnesses and presenting evidence so as to . . . avoid needless consumption of time . . . ." Furthermore, the circuit judge has a duty "to guide the procedure of [a] trial, and in so doing he is not . . . a mere moderator . . . ." *Jackson Yellow Cab Co. v. Alexander*, 246 Miss. 268, 278, 148 So. 2d 674, 678 (1963).

¶73. Gray's trial began on February 11, 2013, which was spent on voir dire and selecting

the jury. The remainder of the trial lasted eight days. The prosecution called numerous witnesses during its case-in-chief, which lasted four full days and a very brief portion of a fifth. Gray raised a number of objections during that time, and the circuit court adequately addressed each one. Gray presented his own case for more than two days. His own testimony encompassed nearly an entire day of the trial. The prosecution's rebuttal was very brief. The transcript of Gray's trial encompasses more than two thousand pages of the record. Not once does Gray cite to any portion of it to support his claim in this issue. Arguments advanced on appeal must "contain the contentions of the appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, *and parts of the record relied on*." M.R.A.P. 28(a)(6) (emphasis added). "Failure to comply with Rule 28(a)(6) renders an argument procedurally barred." *Rogers*, 994 So. 2d at 800 (¶31). Additionally, Gray cites no authority to support his claim that the circuit court committed reversible error by admonishing his attorneys to move along during some unspecified times during the trial. It follows that this issue is further barred based on Gray's failure to cite authority to support his argument.

### XIV. Sentencing

¶74. Gray claims that the circuit court erred when it sentenced him to life without eligibility for parole. According to Gray, the circuit court should have considered sentencing him to life with the possibility of parole. Gray's reasoning is based on the prosecution's decision not to pursue the death penalty.

¶75. "Every person who shall be convicted of capital murder shall be sentenced (a) to

31

death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole . . . ." Miss. Code Ann. § 97-3-21(3) (Rev. 2014). However, "[n]o person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of [Mississippi Code Annotated s]ection 99-19-101 [(Supp. 2014).]" Miss. Code Ann. § 47-7-3(1)(e) (Supp. 2014). The supreme court has held that "[t]he reading of these statutes together indicate[s] that a defendant on trial for capital murder may only be sentenced to death or life imprisonment without eligibility [for] parole." *Flowers v. State*, 842 So. 2d 531, 557 (¶77) (Miss. 2003). Furthermore, "a trial judge may impose the only possible sentence [for capital murder] without formally returning the matter to the jury for sentencing." *Pham v. State*, 716 So. 2d 1100, 1103 (¶21) (Miss. 1998). There is no merit to this issue.

### XV.   Cumulative Errors

¶76.   Finally, Gray claims he is entitled to a new trial based on the cumulative effect of the errors. "This Court may reverse a conviction and sentence based upon the cumulative effect of errors that independently would not require reversal." *McLaurin v. State*, 31 So. 3d 1263, 1270 (¶35) (Miss. Ct. App. 2009) (citation omitted). "However, where there was no reversible error in any part, there is no reversible error to the whole." *Id*. (citation and internal quotation marks omitted). Having found no individual error, there can be no cumulative error. This issue has no merit.

¶77.   **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR EARLY RELEASE IS AFFIRMED.  ALL COSTS**

32

**OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, MAXWELL, FAIR, JAMES AND WILSON, JJ., CONCUR.**