# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00312-COA

MARCUS SHELBY A/K/A SHELBY MARCUS DEMOND A/K/A SHELBY M. DEMOND                                    APPELLANT

v.

STATE OF MISSISSIPPI                                    APPELLEE

DATE OF JUDGMENT:                05/26/2015
TRIAL JUDGE:                     HON. JEFF WEILL SR.
COURT FROM WHICH APPEALED:       HINDS COUNTY CIRCUIT COURT,
                                 FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                 BY: BENJAMIN ALLEN SUBER
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: LAURA HOGAN TEDDER
DISTRICT ATTORNEY:               ROBERT SHULER SMITH
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 09/12/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., FAIR AND WESTBROOKS, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.     A jury in the Hinds County Circuit Court, First Judicial District, convicted Marcus

Shelby of the murder of Duan Penn, and the circuit court sentenced him, as a habitual

offender, to life imprisonment in the custody of the Mississippi Department of Corrections,

without the possibility of parole.  Shelby now appeals, arguing that the trial court erred in

denying his motion for a new trial because the verdict is against the overwhelming weight

of the evidence.  We affirm.

FACTS

¶2. On April 11, 2012, the Jackson Fire Department and the Jackson Police Department were dispatched to a fire near Forest Avenue and Methodist Home Road in Jackson, Mississippi. Officer Clarence Gibson, one of the police officers dispatched to the scene, testified at trial that he observed a body burning in the fire, amidst fragments of blue tarpaulin and woven rope. The body was burned beyond recognition; it was mostly naked, with duct tape wrapped around the face and head.

¶3. Shortly after the body was found, Officer Delanio Sanders of the Jackson Police Department reported his brother Penn missing. Officer Sanders began searching for his brother in areas where Penn was known to frequent, including Marcellos Coleman's residence at 512 Huron Street. Officer Sanders told his superiors that he suspected something had happened to Penn at that location. Around this time, dental records confirmed that the burned body was Penn's.

¶4. On May 18, 2012, pursuant to a search warrant, Officer Robert Bufkin and detectives with the Jackson Police Department conducted a search of 512 Huron Street. Their search led to the discovery of blue tarpaulin fragments and woven rope consistent with that recovered from the burn scene, a roll of duct tape, and evidence of a burn pile where more blue tarpaulin fragments were found.

¶5. Earnest Kendricks, who lived across the street from the Huron Street address, later provided a statement to the police, in which he stated that he had seen Shelby and Penn at the Huron Street address on April 11, 2012, and further that "[he knew] that someone hit

[Penn]."

¶6. On October 2, 2012, a Hinds County grand jury indicted Shelby, Coleman, and Janice Pittman for one count of murder and one count of kidnapping. All three defendants were tried separately.

¶7. During Shelby's trial, jurors heard testimony from Kendricks and Pittman, both of whom lived near 512 Huron Street. Kendricks and Pittman both testified that they had had previous interactions with Shelby, Penn, and Coleman, and were able to identify them.

¶8. Kendricks testified that, on April 11, 2012, Coleman hosted a barbeque at Coleman's residence. Kendricks witnessed the activities at Coleman's residence from where he stood in the yard across the street. He testified that both Shelby and Penn were in attendance. Kendricks further testified that he left the yard shortly after Penn arrived, so he did not see what else happened; however, Kendricks maintained that he overheard Penn say at one point that "he didn't have nothing to do with the break-in." Kendricks continued: "I [saw Pittman] jump over the fence, and I couldn't tell you where she hit him. I couldn't see because of the bushes. [It looked] like something was going on, but I wasn't sure because they [were] all getting loud over there." Then, the following exchange occurred:

> [THE PROSECUTOR]: Now, Mr. Kendricks, in the statement that you wrote - -
>
> [KENDRICKS]: Yeah.
>
> [THE PROSECUTOR]: - - back in 2012, you say you know that someone hit him?

[KENDRICKS]: Yeah, it looked like, but I couldn't tell, though.

[THE PROSECUTOR]: And Marcus - - Marcus Shelby was there at that time?

[KENDRICKS]: Yeah. He was out on the side of the street.

* * * *

[DEFENSE COUNSEL]: And you said Mr. Shelby - - you saw him. He was by the street, correct?

[KENDRICKS]: Yeah.

[DEFENSE COUNSEL]: Okay. And you - - you don't recall - - you didn't see anyone hit Mr. Penn, correct?

[KENDRICKS]: No, I didn't see [anyone] do that.

* * * *

[DEFENSE COUNSEL]: . . . And when [Pittman] jumped the fence, Marcus Shelby was standing at the street, correct?

[KENDRICKS]: Yeah, he was.

[DEFENSE COUNSEL]: And you did not see Marcus Shelby hit Mr. Penn, correct?

[KENDRICKS]: Not while I was there.

[DEFENSE COUNSEL]: Okay. You didn't see him do anything but stand by the street, correct?

[KENDRICKS]: Uh-huh (affirmative response).

¶9.    Pittman testified[1] that she and her boyfriend, Raymond Jackson, were awoken by

_____

[1] Pittman stated at trial that she had chosen to testify because it was "the right thing to do." She denied having been promised leniency by the State in exchange for her

4

shouting on the night of April 11, 2012.  She and Jackson went out onto her porch, where they could see into Coleman's front yard.  There, Pittman saw four men—Coleman, Shelby, a "skinny guy," and a "big guy" with dreadlocks—encircling another man who was lying on the ground, naked.  Pittman heard the men shouting about a break-in and realized that the man on the ground must have been Penn, whom she had recently reported to police as being involved in the break-in at Coleman's home.  The four men were beating and kicking Penn, and at one point a flame arose from Penn's body.  Pittman testified that, at some point, the men noticed her watching them from her porch, and the skinny guy shouted over to her that Penn was accusing her and her daughter of being involved with the break-in at Coleman's home.  Pittman testified that she walked[2] over to Coleman's front yard where the beating was taking place:

> And when I went over there, I was - - I was standing like - - you know, I had - - got down - - as close to - - on my knees because I was standing - - I was right there at [Penn's] head.  And I had - - one of the guys that was - - he was kind of on my left side over here and then Shelby was on the right side.

Pittman confronted Penn about accusing her of being involved in the break-in; then she punched him four times in the face; during this time, Shelby, the skinny guy, and the big guy with dreadlocks were still surrounding Penn:

testimony against Shelby.

[2] Pittman did not mention hopping over a fence to get to Coleman's yard, as Kendricks had described; rather, she testified that she "had to walk around because the car was in the driveway and the truck was parked on the corner by a bush toward the - - as you - - almost into the driveway."

5

Shelby was standing - - well, if I was on my knees and I was right there at the - - at the head, he was on the, like, right here - - the left side of me - - on the right side of me.

Pittman further testified that Coleman had walked somewhere else at this point[3] and that Penn was still alive during that time.

¶10.    After partaking in the beating, Pittman returned home and noticed that she had blood on her shirt, so she changed clothes. Sometime later, the big guy with the dreadlocks walked over and asked Pittman for her bloody shirt. Pittman gave him the shirt, which he took and put in a burn barrel along with other pieces of evidence. Pittman testified that, after this, she stood out on her porch for a while[4] and watched as the four men continued beating Penn, then carried his body to Coleman's backyard. After about fifteen or twenty minutes, the skinny guy went to Shelby's house, which was apparently up the street, and got into a car. Pittman watched as the skinny guy backed the car into Coleman's driveway, and then both the skinny guy and Shelby went into the backyard. About twenty minutes later, Pittman saw the skinny guy and big guy with dreadlocks place something wrapped in a tarp into the trunk of the car. All four men subsequently got into the car and drove away. Pittman testified that, twenty

---

[3] Pittman also testified that Coleman had "taken a gun and shot at [Penn]" at some point. Likewise, Kendricks testified that Coleman "shot down at [Penn]." However, the record is unclear as to when exactly this occurred. A gun was later obtained from 512 Huron Street.

[4] At some point, Kendricks wandered over to Pittman's porch and sat there as well. Pittman testified that her daughter's girlfriend also came out onto the porch for a bit; however, Pittman did not give the daughter's girlfriend's name, and the girlfriend did not testify at Shelby's trial. Jackson, Pittman's boyfriend, did not testify at trial either.

minutes later, Coleman and the big guy with dreadlocks returned and said that they needed some gasoline but had no cash. Coleman asked Pittman to purchase some, so Pittman walked down the street to the store and filled up a small jug with gasoline, which she gave to Coleman. Pittman testified that she subsequently left the scene to pick her daughter up from work.

¶11. Detective Carlotta Taylor[5] with the Jackson Police Department also testified at Shelby's trial. On April 11, 2012, Detective Taylor was called to the scene where the burning body was found. Detective Taylor testified that she collected evidence and conducted an investigation in the following weeks. Around the time that the body was identified as Penn's, Detective Taylor received information from Officer Sanders regarding 512 Huron Street. Detective Taylor and several other detectives went to 512 Huron Street; however, no one was home, so they wandered over to Pittman's residence, nearby. Detective Taylor testified that Pittman and two other subjects were taken to the police station for interviewing; while there, Pittman told Detective Taylor about the "beating, burning[,] and torture of Duan Penn" that had taken place. Pittman also admitted to Detective Taylor that she had participated in the beating. At this point in Detective Taylor's testimony, the State offered as exhibits two photo-lineup identifications. Detective Taylor testified that, after Pittman was brought to the police station, Pittman correctly identified Shelby in one lineup

---

[5] Detective Taylor was known as Detective Carlotta Bacon at the time of the incident. At the time of the trial, she had married and changed her surname to Taylor.

7

and Coleman in the other. On the lineup depicting Shelby, Pittman handwrote, "[Shelby] was standing around, was also hitting him, as well."

¶12. On cross-examination, defense counsel asked Detective Taylor whether she also interviewed Jackson, Pittman's boyfriend, and whether she tried to coerce Jackson into identifying Shelby by pointing at pictures and asking Jackson about each picture individually. Detective Taylor admitted to interviewing Jackson but denied trying to make Jackson identify Shelby. Defense counsel asked for a bench conference and requested a recess so that Detective Taylor could review the video recording of her interview with Jackson, asserting that the video portrayed that she did in fact attempt to coerce Jackson into identifying Shelby. However, the video recording was about two hours long and defense counsel admitted that he did not know which portion of the tape was relevant to the issue. Defense counsel offered to let Detective Taylor read a transcript of the video that had been prepared. The judge agreed to let counsel review the transcript to find the relevant portion. However, defense counsel ultimately abandoned his request and stated, "Your Honor, I'm ready to proceed. I think we - - I'm just going to move on. I mean, I could use it, but I'll just get on to some other stuff, Judge." The trial judge replied, "All right. So you're abandoning that effort to cross-examine on the transcript of the videotape?" Defense counsel replied, "Until another issue arises where there's a lack of recollection, and I suspect that may happen." However, no such issue ever arose and the video recording was not mentioned again.

¶13. Additionally, during Detective Taylor's testimony at trial, she was asked about the

8

statement that Jackson made to police:

> [DEFENSE COUNSEL]: [Jackson] said that - - he also said that [Shelby] was standing in the street, walking down the street and didn't go with anybody to dispose of the body, correct? He said [Shelby] walked up the street?
>
> [DETECTIVE TAYLOR]: There was a statement that [Shelby] walked up the street.
>
> [DEFENSE COUNSEL]: Okay. And that was Mr. Jackson that stated that, correct? He said everybody had left except [Shelby]. He walked up the street. That's his statement, correct?
>
> [DETECTIVE TAYLOR]: I know that there was a statement that he walked up the street. I'm not sure if it was by [Jackson] or not.

However, Jackson, himself, did not testify at trial, and his statement to police was not included in the record.

¶14. The jury also heard expert testimony from Jacob Burchfield, with the Mississippi Crime Laboratory, who testified that the rope samples and blue tarp collected from the burn scene were consistent with that recovered from 512 Huron Street. Finally, Dr. Mark LeVaughn, the chief medical examiner at the Mississippi medical examiner's office, testified that Penn's injuries were consistent with blunt trauma, strangulation, and asphyxiation. Dr. LeVaughn testified that he was unable to determine which of these injuries was the ultimate cause of Penn's death; however, Dr. LeVaughn testified that each injury played a role in Penn's death.

¶15. The jury ultimately convicted Shelby of depraved-heart murder, but found him not guilty of kidnapping. On May 26, 2015, Shelby was sentenced to life in prison without

9

parole as a habitual offender[6] pursuant to Mississippi Code Annotated section 99-19-83 (Rev. 2015). Shelby filed a motion for a judgment notwithstanding the verdict (JNOV) or for a new trial on May 27, 2015. The court denied Shelby's motion on May 29, 2015.

¶16. On January 19, 2016, Shelby filed a handwritten letter in which he requested an out-of-time appeal, maintaining that, after trial, he had fully intended to appeal but his counsel had failed to take action on his behalf. On February 11, 2016, Shelby's attorney filed a motion for leave to file an out-of-time appeal, arguing that he never received a copy of the May 29, 2015 order denying Shelby's motion for JNOV or a new trial. On February 12, 2016, the circuit court granted the motion,[7] and Shelby filed his notice of appeal on February 29, 2016. Shelby's trial attorney subsequently withdrew from his appeal, and Shelby was allowed to proceed in forma pauperis with newly appointed appellate counsel.

## DISCUSSION

¶17. Shelby argues that the verdict was against the overwhelming weight of the evidence for three reasons: (1) the only evidence of his involvement in Penn's beating came from Pittman's testimony, which was directly contradicted by Kendricks's testimony, Jackson's

---

[6] Shelby had previously been convicted of multiple offenses, including aggravated assault, possession of contraband while in prison, and possession of a firearm as a felon.

[7] We note that pursuant to the provisions of Rule 4(h) of the Mississippi Rules of Appellate Procedure, the trial court was without authority to grant the out-of-time appeal because it had been more than six months since the entry of the order overruling Shelby's post-trial motion. However, pursuant to the authority granted by Rule 2 of the Mississippi Rules of Appellate Procedure, we, for good cause as shown in Shelby's January 19, 2016 letter, suspend the thirty-day appeal-time requirement and allow this appeal to proceed.

testimony, and Pittman's own statement to police; (2) "[t]he only evidence linking Shelby from Pittman's original statement to police involved a lineup procedure that was questionable at best"; and (3) Pittman had improper motives in testifying against Shelby, due to her status as a co-indictee in the crime.

¶18.    "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, [an appellate court] will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (¶18) (Miss. 2005) (citation omitted). "However, the evidence should be weighed in the light most favorable to the verdict." *Id*. (citation omitted).

¶19.    First, Shelby argues that Kendricks and Pittman offered directly contradictory testimony, in that Kendricks testified that Shelby was "out by the street during the period when Penn was attacked," while Pittman testified that Shelby was standing beside her when she began partaking in the beating.    However, this argument presents an improper characterization of the facts.    Kendricks never said that Shelby was standing in the street when Pittman actually punched Penn; rather, Kendricks testified that Shelby was standing in the street when Pittman jumped the fence.    Both Kendricks's testimony and Pittman's testimony could be true if Shelby was standing out in the street when Pittman jumped the fence, and then ran over to where Pittman was when she began punching Penn.    It is unclear from the record whether this set of facts is correct; however, taking both Kendricks's and

11

Pittman's testimonies into consideration, we find no direct contradiction between the two. As such, this issue is without merit.

¶20. Second, Shelby argues that Jackson's statement to police directly contradicts Pittman's testimony; however, like Shelby's argument regarding Kendricks's testimony, this argument does not present an entirely accurate depiction of the facts. Detective Taylor testified that Jackson, in his statement to police, merely stated that Shelby walked up the street, without specifying when he did so. As with Kendricks's testimony, Jackson's statement is not necessarily in conflict with Pittman's testimony that Shelby was standing beside her as she beat Penn, for Shelby could have been up the street before the beating began but returned to where Pittman was as she began to beat Penn, or he could have gone up the street after the beating occurred. Therefore, this argument is also without merit.

¶21. Third, Shelby argues that Pittman's testimony at trial varied from the oral statement she gave to police, because she did not implicate Shelby in her oral statement. She did not include Shelby in her account of the events until she saw his name and picture in a photo lineup. At that time, she circled his name. Shelby further asserts that this photo-lineup identification was improper. However, Shelby fails to support either of these assertions. "Arguments advanced on appeal must contain the contentions of the appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." *Gray v. State*, 202 So. 3d 243, 262 (¶73) (Miss. Ct. App. 2015); *see also* M.R.A.P. 28(a)(7). "Failure to comply with Rule 28(a)[(7)] renders

12

an argument procedurally barred." *Id*. (citation omitted). The record is void of any transcription of Pittman's oral statement to police. Further, her photo-lineup identification of Shelby was excluded from the record. Additionally, Shelby offers no facts or authority to suggest how Pittman's lineup identification was improper. Thus, this issue is without merit.

¶22. Lastly, Shelby argues that doubt should be cast upon Pittman's testimony, due to her status as Shelby's co-indictee. However, to this argument, we reply simply that "the jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness." *Reeves v. State*, 825 So. 2d 77, 80 (¶8) (Miss. Ct. App. 2002) (citations omitted). Further,

> [t]his Court may not make an assessment on the credibility of the trial witnesses as this task is one for the jury presiding over the matter. *Kinzey v. State*, 498 So. 2d 814, 818 (Miss. 1986). When this Court analyzes a jury's verdict to determine whether it goes against the overwhelming weight of the evidence, we must keep in mind that the jury is the ultimate finder of fact. This Court does not have the task of re-weighing the facts in each case to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible.

*Id*. We refuse to usurp the jury's role as fact-finder in this matter. It chose to convict Shelby after hearing each witness's testimony at trial. Furthermore, it heard Pittman acknowledge that she was a co-indictee, yet it still chose to convict him. We will not disturb its verdict based on these facts.

¶23. In summary, we note that not one witness testified that he or she saw the entirety of the beating: Kendricks testified that he only heard yelling and that he knew Penn had been

13

hit, while Pittman testified that she and Jackson were awoken by shouting and came outside as the beating was already underway. Thus, it is entirely possible—and plausible, according to the jury—that Shelby may have wandered down the street at some point, while still partaking in Penn's beating, and ultimately his murder. He need not have been present for the entire beating to have played a role in Penn's death. Furthermore, the jury clearly relied on Pittman's testimony that she witnessed Shelby, along with the other three men, beating Penn from where she stood on her porch. Pittman's testimony, along with Kendricks's, places Shelby at the scene of Penn's murder, and Pittman's testimony implicates Shelby in Penn's ultimate death. In viewing all of the above evidence presented in the light most favorable to the verdict, we cannot say that an unconscionable injustice resulted here. Therefore, we affirm the judgment of the circuit court, which adjudged Shelby guilty of murder, as a habitual offender, and sentenced him to life imprisonment, without parole, in the custody of the Mississippi Department of Corrections.

¶24.   **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**

14