CARLTON, J.,
for the Court:
¶ 1. Johnny Ray Sims was indicted for capital murder for the kidnapping and murder of Jamaya Griffith. On appeal, Sims claims that the State failed to provide sufficient evidence to support his conviction. Finding no error, we affirm.
FACTS
¶ 2. On March 1, 2006, Mary Glen Knight (Knight) spent the day caring for her three great-grandchildren — five-year-old Jamaya Griffith, four-year-old Jané[1] *38 Griffith, and their baby sister, Jaylyn Knight. Knight lived on Doc Bass Lane in rural Jefferson Davis County, Mississippi. Sims and his sister, Margaret, lived down the street from Knight; Sims lived in a house he inherited from his parents, and Margaret lived in a trailer behind Sims’s house.
¶ 3. Jané, who was ten-years old at the time of trial, testified that on the day of March 1, 2006, she and Jamaya spent the day playing in the front yard of Knight’s house. Jané stated that Sims approached the girls and asked if their uncle, Lee Morris Knight, was at home. When Jané told Sims that their uncle was at the hospital, Sims asked Jané if she wanted to come over to his house and see his new big screen television. Jané responded that she would have to first check with her great-grandmother to obtain permission.
¶ 4. Knight testified that while Jamaya and Jané played outside in her front yard, she remained inside of the house. Knight explained that when she heard a man’s voice outside, she went to the porch to investigate. Knight spotted Sims, and she stated that once Sims saw her, he left the premises and walked down the road towards his house. Knight asked Jané what Sims had said to her, and Jané repeated that Sims had invited her over to see his big screen television. Knight testified that during this conversation, Jamaya was standing beside her on the porch.
¶ 5. Knight then went back inside of the house to retrieve her laundry, and when she returned to the porch, she testified that Jamaya was no longer in the yard. Jané told Knight she had last seen Jamaya riding her bike down the street and following Sims. Concerned, Knight began searching for Jamaya in the yard and inside of Knight’s house. When she failed to find Jamaya, Knight then went to Sims’s house, where she began knocking on the door and yelling for both Jamaya and Sims. Knight testified she never saw Ja-maya’s bicycle outside of Sims’s house during her search. Knight’s granddaughter, Regina Knight,[2] and daughter, Marlene Asencio, arrived approximately thirty to forty minutes after Knight had started searching for Jamaya.
¶ 6. Knight testified that Sims’s sister, Margaret, eventually came home. Knight asked Margaret to go into Sims’ house and see if he was inside of the house. Margaret beat on the door, but no one answered. Margaret entered Sims’s house through a side door, and then she came out and told Knight that Sims had been asleep. Sims opened the door and exited the house, and he explained that he had been asleep when Knight banged on the door.
¶ 7. Marlene testified that upon arriving on Doc Bass Lane, she went to Sims’s house and found Sims outside. Marlene asked Sims to search his house, but in response, Sims walked next door to Margaret’s trailer. According to Marlene, Margaret eventually asked the women if they wanted to search Sims’s house. Marlene testified that she then observed Sims walk down from Margaret’s trailer and enter the house through a side window. Marlene heard Sims move furniture around before finally unlocking the door. Marlene stated that after entering the house, she smelled bleach in the bathroom. Upon entering the bathroom, she observed Sims’s shirt soaking in bleach, and Marlene testified that “it looked to me like there was blood” on the shirt. Marlene asked Sims why his shirt was soaking in bleach, and she also asked Sims why his shirt looked like it had blood on it. Sims denied that his shirt had any blood on it. *39 Marlene testified that she and Knight proceeded to search the house, but they did not check in the closets or in two of the bedrooms. After failing to find Jamaya, Knight and Marlene called the Jefferson Davis County’s Sheriffs Department.
¶ 8. Deputy Sheriff Ronnie Barnes of the Jefferson Davis County Sheriffs Departs ment responded to the call. When he arrived at Doc Bass Lane, he spoke with the family and then began searching for Jamaya. Barnes questioned Sims, and Sims claimed that he saw Jamaya riding down the road on her bike. Barnes continued to search for Jamaya until Sheriff Henry McCullum summoned him back to Sims’ house. Sheriff McCullum then asked Deputy Barnes to search Sims’s house.
¶ 9. Deputy Barnes testified that upon entering Sims’s house, he found Jamaya’s bicycle, covered by a blanket. He also noticed a strong smell of gasoline. Deputy Barnes eventually found Jamaya’s body, clothed only in a shirt and socks, and lying under a pile of clothes inside the closet of the southwest bedroom. Deputy Barnes called the Mississippi Bureau of Investigation (MBI) for assistance; he then roped off the crime scene and waited for the MBI investigators to arrive.
¶ 10. After his arrest, Sims denied harming Jamaya, and he informed the MBI investigators that earlier that day, he and a friend had driven to Bassfield, Mississippi. Sims explained to the investigators that his girlfriend, Angie Robinson, bleached his shirt that he had worn earlier in the day. Sims informed the investigators that a friend, whom Sims identified as Kenny, also visited his house that day. Sims was unable to provide any identifying details about Kenny; he did not know Kenny’s last name, his address, where he had met Kenny; and he could not describe Kenny’s vehicle. Sims stated that he went to sleep and woke up to knocking on his front door. Sims denied having visited Knight’s house earlier that day.
¶ 11. A crime scene analyst with the MBI testified as to his investigation of the crime scene. The investigator found Ja-maya’s underwear in the closet next to her body. Jamaya’s pants, one of her shoes, and a bloody knife were found in a piece of carpet rolled up in the laundry room. The investigator found Jamaya’s other shoe under the bed in the southwest bedroom. The investigator testified he found blood stains on the mattress in that same bedroom, as well as blood spatters on the wall beside the bed containing the bloody mattress.
¶ 12. Jamaya’s underwear, Jamaya’s pants, Sims’s underwear, the knife believed to have been used to kill Jamaya, and a swatch from the mattress in Sims’s bedroom all tested positive for blood. DNA tests established that a hair removed from Jamaya’s vaginal area belonged to Sims, and the blood on Sims’s underwear and on the mattress contained a mixture of Sims’s DNA and Jamaya’s DNA. Sims’s fingerprint and a palm print were also recovered from the middle of Jamaya’s bicycle handlebar.
¶ 13. At trial, Dr. Steven Hayne, the forensic pathologist who performed the autopsy on Jamaya’s body, testified that he found a total of twelve stab wounds to Jamaya’s body. Dr. Hayne also found superficial injuries to Jamaya’s face and neck. Dr. Hayne testified that the bruising around Jamaya’s neck and the small areas of bleeding over the facial area were consistent with incomplete strangulation. Dr. Hayne also noted a one-inch tear to the vulva and vaginal area, which produced blood. Dr. Hayne ultimately listed the cause of Jamaya’s death as multiple stab wounds. Dr. Hayne testified that the knife found rolled up in the carpet in the *40 utility room appeared consistent with the stab wounds on Jamaya’s body.
¶ 14. Sims was indicted for capital murder, and a trial was held in the Jefferson Davis County Circuit Court. At the close of the State’s case-in-chief, Sims moved for a directed verdict, which was ultimately denied. After the trial, the jury convicted Sims of capital murder, and the circuit judge sentenced Sims as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev.2007) to life without eligibility for parole or probation.
¶ 15. Sims filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a motion for a new trial, which the circuit judge subsequently denied. Sims appeals the denial of his post-trial motions, arguing that the circuit court should have granted his motion for a JNOV because the evidence lacked legal sufficiency to support the conviction of capital murder.
STANDARD OF REVIEW
¶ 16. Regarding the legal sufficiency of the evidence, the Mississippi Supreme Court in Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) explained:
[I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for [a] directed verdict or for [a JNOV], the critical inquiry is whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.
(Internal citation and quotations omitted). Further, the appellate court should examine the evidence in the light most favorable to the prosecution and determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (citation omitted). This Court will reverse a conviction only if, upon examination of the evidence, we find that the evidence “point[s] in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty[.]” Id,, (citation omitted). In sum, a reversal on the ground of insufficient evidence means that an acquittal was the only proper verdict for the defendant. Id. at 844 (¶ 18).
DISCUSSION
¶ 17. Sims argues that the circuit court erred in denying his motion for a directed verdict based on the insufficiency of the evidence to support his capital murder conviction. Sims submits that he was indicted for capital murder, not simple murder, due to the State’s claim that Sims killed Jamaya while in the process of kidnapping her. Sims claims that for the capital murder conviction to stand, the State bore the burden to prove each element of the underlying kidnapping offense beyond a reasonable doubt. Sims argues that the State failed to meet its burden of providing sufficient evidence to prove that Sims kidnapped Jamaya.
¶ 18. Mississippi Code Annotated section 97-3-53 (Supp.2011) defines kidnapping as:
Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, or without lawful authority shall forcibly seize, inveigle or kidnap any child under the age of sixteen (16) years against the *41 will of the parents or guardian or person having the lawful custody of the child.
We acknowledge the prosecution is required to prove each element of the underlying offense of kidnapping in order for the capital-murder conviction to stand. Underwood v. State, 708 So.2d 18, 35 (¶ 49) (Miss.1998). Sims argues that the State failed to produce evidence that he forcibly seized or confined Jamaya. Sims cites, to Jané’s testimony at trial, wherein Jané, one of the last people to see Jamaya alive, stated that she saw Jamaya riding her bicycle down the street behind Sims. Sims submits that Jané never testified that Sims threatened or forcibly seized Jamaya.
¶ 19. Sims further argues the State failed to provide sufficient evidence that he inveigled or tricked Jamaya into entering his house. Sims claims Jané testified that during Sims’s alleged conversation inviting Jané over to his house, Jamaya was several yards away. Sims further claims that Jané stated she was unsure if Jamaya even overheard the conversation.
¶ 20. In examining this issue, we turn to guidance from the Mississippi Supreme Court. In Hughes v. State, 401 So.2d 1100, 1105 (Miss.1981), the supreme court restated Mississippi Code Annotated section 97-3-51 (Rev.2006) in order to clearly set forth the different elements that may constitute kidnapping under the statute:
Every person who shall, without lawful authority,
(1) forcibly seize and confine any other,
(2) or shall inveigle or kidnap any other
(3) with intent
(a)to cause such person to be secretly confined or imprisoned in the state against his will,
(b) or to cause such other person to be sent out of this state against his will,
(c) or to cause such other person
(1) to be deprived of his liberty,
(2) or in any way held to service against his will ...
Under the statute the [S]tate must prove that a person, without lawful authority, either (1) forcibly seized and confined another person, or (2) inveigled or kidnapped another person, intending to subject such other person to either (a), (b), or (c) above.
¶ 21. The State argues that Jane’ never testified that Jamaya was standing at a far distance from Jané during her conversation with Sims. In our review of the transcript, regarding the distance between where Sims was standing and where Jama-ya was standing during the conversation, Jané compared the distance to the length from the witness stand to a curtain in the courtroom. However, we do acknowledge that Jané testified that she did not know whether or not Jamaya had heard Sims talking to her about his television.
¶22. The State also cites to Knight’s testimony that Jamaya stood next to Knight when Jané relayed to Knight her conversation with Sims. The State submits that a reasonable juror could infer that Jamaya overheard Sims ask Jané if she wanted to see his big screen television or overheard Jane’s account to Knight of the conversation with Sims. In Myers v. State, 770 So.2d 542, 544 (¶ 7) (Miss.Ct.App.2000), this Court explained that “[ijnvei-gling has no component of force, but only of coaxing. One does not forcibly inveigle. Guilt exists if [the defendant] coaxed [the victim] ... with the intent secretly to confine her against her will.” The Myers Court held that the young girl entered into Myers’s vehicle willingly after he promised to drive her home, but the Court found *42 that such an act constituted inveigling once Myers decided not to take the girl home and instead drove her into another state. Id. at 548 (¶ 23).
¶23. Sims also asserts that only circumstantial evidence of kidnapping exists in the present case. However, in Underwood v. State, 708 So.2d 18, 35 (¶ 49) (Miss.1998), the Mississippi Supreme Court stated: “Circumstantial evidence is sufficient to prove the elements of kidnapping.” The supreme court further explained that “direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt.” Id. (citation omitted).
¶ 24. The State argues that the record contains substantial circumstantial evidence for the jury to find that the prosecution met its burden of proof regarding the kidnapping charge; namely, the State contends that no conceivable reason existed for Jamaya or her bicycle to be found inside of Sims’s house but for Sims inveigling her to enter his house under the premise of seeing his new television. The State submits that a reasonable juror could infer that Sims tricked Jamaya into coming inside of his house, confined her, and then took her bicycle inside to conceal her location.
¶ 25. The State cites Neal v. State, 451 So.2d 743, 757-58 (Miss.1984), wherein the supreme court held that circumstantial evidence such as the victim’s dress, location of the body, and bruised condition of the body were sufficient to show that the victim did not voluntarily accompany Neal. In the present case, the bruises to Jamaya’s face and neck, the evidence of strangulation, the removal of part of her clothing, and also the tears in her vaginal area all “would indicate that force was used at some point in time to make her do something against her will.” Id. at 758.
¶ 26. Under our judicial system, the jury is charged with the responsibility for weighing and considering conflicting evidence and the credibility of witnesses. Id. See, e.g., Pearson v. State, 428 So.2d 1361, 1363 (Miss.1983); Gathright v. State, 380 So.2d 1276, 1278 (Miss.1980). After reviewing the transcript and record, we find that the jury in the present case was properly instructed regarding the elements of kidnapping. We also agree that the State presented sufficient circumstantial evidence to prove the elements of kidnapping such that reasonable and fair-minded jurors could have found that Sims inveigled Jamaya with the intent to cause her to be secretly confined or imprisoned against her will. See Miss.Code Ann. § 97-3-19(2)(e) (Rev.2006). Indeed, the verdict herein reflects that the jury found Sims was guilty of the kidnapping of Jama-ya prior to her murder. Considering the evidence in the light most favorable to the prosecution, we find that reasonable jurors could find Sims guilty of kidnapping beyond a reasonable doubt. This issue is without merit.
¶ 27. THE JUDGMENT OF THE JEFFERSON DAVIS COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE AS A HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JEFFERSON DAVIS COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, BARNES, ISHEE, ROBERTS, MAXWELL AND RUSSELL, JJ., CONCUR.

. The name is spelled as Jane' in the record, but we have reflected it as Jané in this opinion.

. Regina Knight is Jamaya's mother.