# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01726-COA

MATTHEW JONATHAN MOBERG A/K/A          APPELLANT
MATTHEW J. MOBERG A/K/A MATTHEW
MOBERG

v.

STATE OF MISSISSIPPI          APPELLEE

DATE OF JUDGMENT:    10/04/2018
TRIAL JUDGE:    HON. DALE HARKEY
COURT FROM WHICH APPEALED:    GREENE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:    OFFICE OF STATE PUBLIC DEFENDER
    BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:    OFFICE OF THE ATTORNEY GENERAL
    BY: ABBIE EASON KOONCE
DISTRICT ATTORNEY:    ANGEL MYERS McILRATH
NATURE OF THE CASE:    CRIMINAL - FELONY
DISPOSITION:    AFFIRMED - 05/05/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WESTBROOKS, McDONALD AND McCARTY, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1. On August 24, 2017, Matthew Jonathan Moberg was indicted for capital murder committed during the course of a kidnapping. A Greene County Circuit Court jury found Moberg guilty of the capital murder of Brian "Jesse" Parker (Jesse), and Moberg was sentenced to life in prison without eligibility for parole. Moberg's post-trial motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial was denied. Aggrieved, Moberg appeals.

**FACTS**

¶2.     On or about May 19, 2017, Moberg and his girlfriend, Savannah Harvison, broke-up. Three days later, on May 22, 2017, Moberg purchased a stun gun from pawnbroker Nicholas Hillman at Holley's Pawn Store. Not long after midnight the next day, May 23, 2017, Harvison sat in the truck with Moberg and confessed to cheating on him the previous weekend with his brother, Dillon, and his good friend, sixteen-year-old Jesse. Harvison further testified that even though they had broken up on May 19, Moberg would not leave her alone, and she was trying to make him lose interest.

¶3.     After the conversation with Harvison, Moberg sent the following text message to Jesse: "I know what you did." Moberg sent a second text message to Jesse five minutes later, which read, "You got drunk. LOL." According to Jesse's mother, Tina Parker, Moberg showed up at their house between 5:00 and 6:00 a.m., looking for Jesse. Tina told Moberg that Jesse was asleep and that Moberg should leave and come back later.

¶4.     At 11:09 a.m., Moberg sent his brother the following text message: "Dillon, remember this: No matter how drunk I am, I would never F someone that you love – that you're in love with. Just remember that because I'm sparing you." After that, he sent Jesse the following text message: "Oh yeah, I forgot to tell you I'm just going to let it go because honestly Savannah is not worth my time and my effort and I am tired of all her b***S*** and the heart drama so it is over with between me and her for good." Shortly before noon, Moberg came back and woke Jesse. Jesse told Tina that he was going to help Moberg move into his new trailer. Tina never saw her son again after he left with Moberg around noon. Later that

afternoon, Moberg returned to Tina's house without Jesse. Moberg told Tina that he had dropped Jesse off thirty minutes earlier and that Jesse had gotten into a black Toyota Camry with some people he (Moberg) did not know. Moberg told Tina he had returned so soon because Jesse had left his cell phone in his (Moberg's) truck. Tina testified that she did not hear Moberg's truck when he claimed that he dropped Jesse off. Further, Tina testified that Moberg's clothes were wet.

¶5.    Detective Matthew Peak testified that between the time Moberg picked Jesse up from Tina's house around 11:30 a.m. and returned in wet clothes that afternoon, Moberg and Jesse had been to Mississippi. Surveillance footage from a BP gas station in Wilmer, Alabama, showed Moberg's truck heading west toward Mississippi at 12:22 p.m. Video footage at the Dollar General store in Lucedale, Mississippi, showed Moberg and Jesse entering the store at 12:32 p.m. and leaving the store at 12:36 p.m.[1]

¶6.    According to records, Moberg did not send or receive any text messages between 11:59 a.m. and 1:23 p.m. At 1:23 p.m., Moberg sent a text message to Savannah that said, "I need you now, it's urgent." He also called her phone three times, but she never picked up. After the three attempted phone calls, he sent the following text messages to Jesse's phone at 1:40 p.m.: "Hey bro, where are you? You left your phone in my car," and "By the way how do you like my place on old Pascagoula Road nice huh." The same BP gas station camera that caught Moberg's truck going west toward Mississippi at 12:22 p.m. captured him heading back into Alabama at 1:47 p.m.

---

[1]A sales receipt from the same Dollar General store in Lucedale, Mississippi, was later found in the front passenger seat of Moberg's truck.

¶7.     According to his supervisor, Mirsad Alidemovic, Moberg showed up to work at Hard Rock Stone & Tile around 2:00 p.m. Moberg was turned away from work by Alidemovic and told to come back the next morning.[2] Before leaving, Moberg spoke to one of his co-workers, Christopher Tullos. According to Tullos, Moberg told Tullos that his truck had broken down in Silas. Tullos testified that Moberg was wet from head to toe and that there was sandy dirt on his right leg. Tullos further stated that Moberg's shoes were so wet they "squished" when Moberg walked. Moberg told Tullos that had fallen in some water. Moberg left work and went to Tina's house and gave her Jesse's phone.

¶8.     After leaving Tina's house Moberg went to the apartment of Walter and Logan Frazier. Moberg and Logan were friends. Walter testified that Moberg's hair was wet and that Moberg emptied the contents of his wallet on the table so it could dry out. According to Logan, while he and Moberg were alone in the living room, Moberg said Jesse was missing. According to Logan, Moberg further stated that he and Jesse got into a fight and that he had strangled Jesse. Moberg told Logan that he convinced Jesse to go with him to Mississippi by telling Jesse "that they were going to go and get drugs." Logan told the jury the reason he did not immediately call the police was "I feared for mine and my father's life."

¶9.     Later on May 23, Tina began calling around looking for her son without any results. She could not find anyone who had seen her son that day other than Moberg, so she "called the cops." According to Detective Peak, the authorities responded and arrived at Tina's house around 11:30 p.m. She told the authorities that Jesse was last seen with Moberg and showed

---

[2] Moberg was supposed to be at work at 7:00 a.m. on the morning of May 23, not 2:00 p.m. Moberg told Alidemovic he was late for work because his truck had broken down.

4

them a text message she had received earlier from Moberg, which read, "I hope they can identify him and locate where he's at."

¶10. Law enforcement finally got in contact with Moberg in the early morning hours of May 24. Detective Peak testified they immediately wanted to speak with Moberg upon learning that Jesse was last seen with him. Detective Peak went to the trailer park where Moberg had recently rented a place, the trailer Moberg claimed Jesse helped him move into, but no one was living there yet. Detective Peak called Moberg's cell phone, and Moberg answered and agreed to meet investigators at a gas station. Moberg met Detective Peak and Sergeant Phillips at 4:00 a.m. at an Exxon station. During this initial conversation, Moberg said he had picked Jesse up earlier that day because he needed help moving into his trailer. He stated he did not know where Jesse was and that he had dropped him off earlier at his house. Moberg said he went to work at Hard Rock Stone & Tile after he dropped Jesse off at his house. When asked about the text message he sent to Tina wishing her good luck in finding and identifying Jesse, Moberg said he saw Jesse get into a black vehicle with people who looked like "dope heads" when he dropped Jesse off at home. Moberg also told Detective Peak that when he dropped Jesse off earlier "they said their goodbyes and they said I love you." Detective Peak thought this was odd. Moberg agreed to an interview at the station. During the interview, Moberg denied stopping anywhere with Jesse or going to Mississippi.[3]

¶11. After interviewing Moberg, officers began trying to verify Moberg's time-line of

_____

[3] The officers did not yet have any of the video footage showing Moberg and Jesse in Mississippi on May 23.

events. They went to Hard Rock Stone & Tile sometime after lunch. As they got out of the police car, Moberg saw them and took off on foot. The officers ultimately apprehended Moberg. The officers noticed a Dollar General receipt on the front seat of Moberg's truck, which showed Moberg lied during his interview. Moberg's truck was towed from Hard Rock Stone & Tile to an FBI office, where a search warrant was executed. The officers found a GPS tracking device on Moberg's truck that had been installed by the dealership. Using data from the GPS tracker, the Dollar General receipt, and bank records, the officers were able to track Moberg's actual movements the day Jesse disappeared.

¶12.　Kenneth Johnson, an inmate in custody with Moberg, testified that he overheard Moberg tell two other inmates that he had hit Jesse over the head, stunned him four times with a stun gun, then held his head under water in the mud until he died. Johnson said Moberg confessed to doing this over a girl.

¶13.　Jesse's body was found on May 31, 2017. Agent Trey Collins found Jesse's body while searching around Highways 98 and 63 North. He testified Jesse was found 24.1 miles from the Alabama line. Jesse's body was partially submerged in water near a culvert. Dr. Mark LeVaughn testified that due to decomposition, he was not able to form an exact opinion as to cause of death, but he was able to conclude through elimination of other causes that the cause of death was homicide.

¶14.　After a jury trial on September 24-28, 2018, in the Circuit Court of Greene County, Mississippi, with the Honorable Dale Harkey presiding, Moberg was convicted for the capital murder of Jesse Parker during the course of a kidnapping. Moberg was sentenced to life in

the custody of the Mississippi Department of Corrections without eligibility for parole. Moberg's trial counsel filed a post-trial motion for a JVOV or new trial, which the trial court denied. Aggrieved, Moberg appeals.

## ISSUES

¶15. Moberg raises two issues on appeal. First, Moberg argues the trial court erred in denying his post-trial motion, arguing the evidence presented was insufficient to sustain a conviction for killing during the course of a kidnapping. Secondly, Moberg argues the trial court erred in allowing the State to enter its Exhibit 25 into evidence. Moberg asserts the photo of Jesse's decomposing body was gruesome, served no evidentiary purpose, and was far more prejudicial than probative. As such, the court should have, according to Moberg, excluded the photograph.

## STANDARD OF REVIEW

¶16. Regarding the legal sufficiency of the evidence, the Mississippi Supreme Court has stated that "[w]hen reviewing a case for sufficiency of the evidence, all credible evidence that is consistent with guilt must be accepted as true, and the State is given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018) (internal quotation marks omitted). We will reverse and render if reasonable jurors could not have found the defendant guilty beyond a reasonable doubt. *Id*. We will affirm the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt based on the evidence." *Id*. (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)).

7

¶17. Regarding a trial court's decision to admit or exclude evidence, our Supreme Court has stated that "we review the decision to admit or exclude evidence under an abuse of discretion standard." *Bonds v. State*, 138 So. 3d 914, 917 (¶5) (Miss. 2014).

## DISCUSSION

### I.  Sufficiency of the Evidence

¶18. Moberg argues that the circuit court erred in denying his motion for a JNOV based on the insufficiency of the evidence to support his capital murder conviction. Moberg was convicted of capital murder during the course of kidnapping, under Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 2015). Moberg correctly argues that for the capital murder conviction to stand, the State bore the burden of proving each element of the underlying kidnapping offense beyond a reasonable doubt. Moberg argues the State failed to meet its burden of providing sufficient evidence proving he kidnapped Jesse.

¶19. Mississippi Code Annotated section 97-3-53 (Rev. 2014) defines kidnapping as the following:

> Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any vulnerable person as defined in Section 43-47-5 or any child under the age of sixteen (16) years against the will of the parents or guardian or person having the lawful custody of the child, upon conviction, shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict. If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections.

Moberg argues that the State failed to produce evidence that he forcibly seized or confined Jesse and further argues the State failed to provide sufficient evidence that he inveigled or

tricked Jesse into getting in his truck and leaving with him.

¶20.    Moberg specifically argues on appeal that "[t]he record in this case does not show that Jesse was not free to leave or that he was confined against his will." Moberg argues that the State did not present any evidence that Moberg forcibly seized Jesse on the day he was killed. The record is clear that Jesse left his house with Moberg around noon on May 23, 2017, intending to help Moberg move into a trailer. However, the statute does not require as the only means of proving kidnapping, that the State prove Moberg "forcibly seized" Jesse. The statute allows the State to proceed under the "inveigling" theory. This Court has held that "inveigling has no component of force, but only of coaxing. One does not forcibly inveigle. Guilt exists if [the defendant] coaxed the [victim] into his vehicle with the intent secretly to confine her against her will." *Myers v. State*, 770 So. 2d 542, 544 (¶7) (Miss. Ct. App. 2000). Moberg argues that there is no evidence he intended to cause Jesse to be confined or harmed and further that the evidence only suggests that he "possibly inveigled or tricked Jesse into getting into his truck with him." Moberg's argument fails to acknowledge our Supreme Court's precedent regarding evidence of kidnapping, specifically inveigling: "[c]ircumstantial evidence is sufficient to prove the elements of kidnapping. Direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Underwood v. State*, 708 So. 2d 18, 35 (¶49) (Miss. 1998) (citation and internal quotation mark omitted). Regarding intent, "[t]he Supreme Court has held that kidnapping is not a specific intent crime. That means that no proof is needed that [the defendant] had the specific intent to kidnap at the time of taking this girl.

9

'It is sufficient that the circumstances resulted in such as manner as to effect a kidnapping as opposed to an actual intent to kidnap, i.e. it is not necessary to establish the mental state of intent by direct evidence.'" *Myers*, 770 So. 2d at 547 (¶22) (quoting *Williams v. State*, 544 So. 2d 782, 789 (Miss. 1987)).

¶21.    Regarding sufficient circumstantial evidence of kidnapping under the inveigling theory, this Court has held that the "significance of the holding that no specific intent is needed is that [the defendant] need only to have the intent to cause the events that followed, the intent forming at each stage. That the [victim] got into his vehicle willingly with the promise to take her the few blocks home constituted a deceitful act, an 'inveigling,' when [the defendant] in fairly short order decided not to take her home and instead took her to Alabama." *Id*. at 548 (¶23). Following our Supreme Court's precedent, this Court further addressed circumstantial evidence sufficient for proof of inveigling, providing the following:

> [T]he supreme court held that circumstantial evidence such as the victim's dress, location of the body, and bruised condition of the body were sufficient to show that the victim did not voluntarily accompany Neal. In the present case, the bruises to Jamays's face and neck, the evidence of strangulation, the removal of part of her clothing, and also the tears in her vaginal area all 'would indicate that force was used at some point in time to make her do something against her will.'

*Sims v. State*, 93 So. 3d 37, 42 (¶25) (Miss. Ct. App. 2011) (quoting *Neal v. State*, 451 So. 2d 743, 758 (Miss. 1984)).

¶22.    Looking at the record, there was overwhelming and sufficient evidence to support Moberg's conviction, especially when viewed in light of the precedent cited above. Moberg got Jesse to leave his mother's house. Jesse told his mother he was leaving to help Moberg

10

move into his new trailer. Moberg and Jesse never moved anything. Moberg also had to convince Jesse to go to Mississippi and accomplished that by telling him they were going to get drugs. Neither happened. Jesse did not help Moberg move, and they did not obtain drugs. Video footage shows that Jesse was with Moberg in Lucedale, Mississippi. Jesse never came back from Mississippi. Moberg sent multiple text messages to Jesse's phone intending to create some semblance of an alibi. Moberg even returned Jesse's phone to Tina. Numerous witnesses testified that Moberg was soaking wet when they saw him upon his return from Mississippi. GPS data, surveillance video, and text messaging provide evidence to prove Moberg's location and the time line of events leading up to Jesse's death. Jesse's body was found off the route Moberg traveled with Jesse on May 23. He did not die of natural causes. The location of Jesse's body explains why Moberg's clothes were wet upon his return to Alabama that afternoon. Moberg never admitted he was even in Mississippi until after he was apprehended. Finally, Kenneth Johnson, an inmate in custody with Moberg, testified that he overheard Moberg tell two other inmates that he had hit Jesse over the head, stunned him four times with a stun gun, then held his head under water in the mud until he died. Johnson said Moberg confessed to doing this over a girl. As such, this issue is without merit.

¶23. We find sufficient evidence exists to support the conviction and the trial court's denial of Moberg's post-trial motion.

## II. Exclusion of State's Exhibit 25

¶24. Moberg argues that the photo of Jesse's corpse shown to the jury was gruesome, served no evidentiary purpose, and was more prejudicial that probative. Moberg further

11

asserts on appeal that the photo did not aid in describing the circumstances of the killing and corpus delicti, nor did the photo describe the location and cause of death. He contends that the photo did not supplement or clarify any testimony.

¶25.  The exclusion of relevant evidence is governed by Rule 403 of the Mississippi Rules of Evidence, which states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." M.R.E. 403. "Appellate courts review a trial court's decision to admit or exclude evidence under an abuse of discretion standard." *Bonds v. State*, 138 So. 3d 914, 917 (¶5) (Miss. 2014). "[T]he admissibility of photographs rests within the sound discretion of the trial court." *Manix v. State*, 895 So. 2d 167, 177-78 (¶30) (Miss. 2005). "*Some* probative value is the only requirement needed to buttress a trial judge's decision to allow photographs into evidence." *Walker v. State*, 913 So. 2d 198, 231 (¶118) (Miss. 2005) (citation and internal quotation marks omitted).

¶26.  A photograph has probative value if it supplements or clarifies a witness's testimony or describes a cause of death. *Spann v. State*, 771 So. 2d 883, 895 (¶31) (Miss. 2000). "Photographs that aid in describing the circumstances of the killing, the location of the body and cause of death, or that supplement or clarify a witness's testimony have evidentiary value and are admissible before a jury." *Ambrose v. State*, 254 So. 3d 77, 135 (¶186) (Miss. 2018), *cert. denied*, 139 S. Ct.1379 (2019). The appellant has a high burden to prove the trial court abused its discretion because, as our Supreme Court has stated, the "discretion of the trial

judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Manix*, 895 So. 2d at 178 (¶30). That being said, there are meaningful limits regarding admissibility, and they are identified by weighing the probative value of the photograph alongside its prejudicial effect. *Ambrose*, 254 So. 3d at 135 (¶188).

¶27.     Regarding the admissibility of a crime victim's photograph, there is a two-part test. *Gray v. State*, 202 So. 3d 243, 254 (¶34) (Miss. Ct. App. 2015). "First, the trial court must determine whether the proof is absolute or in doubt as to identity of the guilty party. Secondly, it must be determined whether the photographs are necessary evidence or simply a ploy by the prosecutor to arouse the passion and prejudice of the jury." *Id*. (quoting *Bonds*, 138 So. 3d at 918 (¶8)).

¶28.     The photograph at issue is State's Exhibit 25. It is an autopsy photograph of the victim, Jesse. At trial, attorneys for both sides agreed this was the "least gruesome" of the available photographs. Moberg's trial counsel objected to the photograph at trial. The trial judge overruled the objection and explained:

> [t]he issue of the photograph itself, in the event that the photograph would aid the jury in understanding his testimony, I believe would be probative and such probative value is not substantially outweighed by its prejudicial effect. There are internal identifiable organs that are identifiable that are depicted in the photograph. There is no blood or gore or anything of that nature. The jury already has before it the fact that the body was left in the woods in a creek, exposed to nature and predatory animals. I do not feel that the probative value is substantially outweighed by the prejudicial effect by the introduction of the photograph. The photograph does depict objective findings made during the course of the autopsy itself, so your objection to the introduction of the photograph will be denied or overruled.

13

Moberg argues that "[t]he photo in this case had no evidentiary value and was probative of nothing."

¶29.    The trial judge weighed the probative value against any prejudicial effect, which was required. Jesse's body was badly decomposed and thus made it difficult for the autopsy to definitively reveal cause of death. The forensic pathologist Dr. LeVaughn testified that due to decomposition, he had to determine homicide as the cause of death by ruling out every other possibility. The trial judge correctly pointed out that the jury already knew the body was found some 10 days after Jesse was killed and, further, the body has been exposed to the elements. Thus, it was reasonable to assume the jury would not have been shocked and surprised by the image. The photograph, as the trial judge reasoned, was potentially needed to verify and highlight findings in the autopsy.

¶30.    Even if the photograph lacked real probative value, as Moberg argues, that does not mean the error was harmful. Errors regarding the admissibility of evidence can be harmless. As our Supreme Court has said, an error is harmless when it is "clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Conley v. State*, 790 So. 2d 773, 789 (¶55) (Miss. 2001). This Court has similarly found harmless error when the evidence of guilt was overwhelming, by holding that "[i]n the alternative, any error suffered was harmless," as the evidence of guilt was overwhelming. *Robbins v. State*, 235 So. 3d 205, 211 (¶11) (Miss. Ct. App. 2017). As such, we find this issue to be without merit or, in the alternative, any error was harmless because the evidence of Moberg's guilt was overwhelming.

¶31.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE,  TINDELL, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR.  LAWRENCE, J., NOT PARTICIPATING.**